1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11  GARY MARION OLIVER,                   )   Case No.: 1:18-cv-1613 - JLT
                                          )
12              Plaintiff,                )   ORDER DIRECTING ENTRY OF JUDGMENT IN
                                          )   FAVOR OF DEFENDANT, THE COMMISSIONER
13        v.                              )   OF SOCIAL SECURITY, AND AGAINST
                                          )   PLAINTIFF GARY MARION OLIVER
14  COMMISSIONER OF SOCIAL SECURITY,      )
                                          )
15              Defendant.                )
                                          )
16  _____ )

17        Gary Marion Oliver asserts he is entitled to a period of disability, disability insurance benefits,

18  and supplemental security income under Titles II and XVI of the Social Security Act.  Plaintiff seeks

19  judicial review of the decision to deny his application for benefits, arguing the administrative law judge

20  erred in evaluating the medical record and his subjective statements.  For the following reasons, the

21  administrative decision is **AFFIRMED**.

22                                    **BACKGROUND**

23        In 2014, Plaintiff filed applications for benefits under Titles II and XVI, asserting he was unable

24  to work due to diabetes, suffering a stroke, and having an aneurysm.  (Doc. 14-7 at 2-16; Doc. 14-8 at

25  6)  The Social Security Administration denied the applications at the initial level and upon

26  reconsideration.  (Doc. 14-4 at 18-20, 53-54)  Plaintiff requested a hearing and testified before an ALJ

27  on August 3, 2017.  (*See* Doc. 14-3 at 16, 56)  The ALJ determined Plaintiff was not disabled under the

28  Social Security Act, and issued an order denying benefits on November 22, 2017.  (Doc. 14-3 at 16-29)

Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on September 21, 2018. (*Id.* at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that a claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

# ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The process requires the ALJ to determine whether Plaintiff (1) is engaged substantial gainful activity, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

## A.    Relevant Medical Evidence

In September 2013, Plaintiff suffered a "severe headache" and sought treatment at the John Muir Medical Center in Conrod.  (Doc. 14-10 at 26)  His blood pressure was 220/150 and Plaintiff tested positive "for methamphetamines, marijuana and opiates."  (*Id.*)  Upon evaluation, physicians "found… a 7-8 mm hemorrhage to [the] left basal region," and Plaintiff was diagnosed with a "[s]troke due to intracerebral hemorrhage."  (*Id.* at 6; *see also id.* at 26)  He was also diagnosed with diabetes mellitus and hypertension at that time.  (*Id.* at 8)

In November 2013, Plaintiff requested Dr. Smriti Shrestha complete a DMV form that would enable Plaintiff to return to work as a tow truck driver.  (Doc. 14-10 at 10, 26)  Dr. Shrestha noted Plaintiff was "a complex patient who had been non compliant in the past" with his hypertension medication and did not have "medical care for a year."  (*Id.* at 10)  Dr. Shrestha also indicated Plaintiff was an "[a]vid meth user," and his toxicology test was positive for meth.  (*Id.* at 10, 15)  According to Dr. Shrestha, Plaintiff "fortunately [had] no residual weakness or incapacity" following his "hemorrhagic stroke."  (*Id.* at 10)  Upon examination, Dr. Shrestha found Plaintiff's cranial nerves were "grossly normal," his sensory exam was grossly within normal limits, his deep tendon reflex was with normal limits, and his motor strength was "5/5 in all 4 extremities."  (*Id.* at 11)  Dr. Shrestha completed the DMV form, but indicated she would not release Plaintiff to work "given high [blood pressure] and non compliance."  (*Id.* at 12)

On December 5, 2013, Plaintiff told Dr. Shrestha that he had been compliant with taking his

blood pressure medication, and he had not used meth "for [the] past 3 weeks or so." (Doc. 14-10 at 15) Plaintiff reported that two weeks before, he began "feeling numb on the [right] side of the body starting on the back of his head, cheek, neck and down to his legs and feet[], except [the] tips of fingers and toes." (*Id.*) Plaintiff denied having weakness, dizziness, shortness of breath, and lightheadness. (*Id.*) Dr. Shrestha noted Plaintiff's blood pressure was 178/118. (*Id.* at 16) She found Plaintiff's cranial nerves were grossly normal and his motor strength was "5/5 in all 4 extremities," though he had "subjective numbness on the [right] side." (*Id.*) Dr. Shrestha diagnosed Plaintiff with "new onset hemiparesis and uncontrolled [hypertension]" and directed him to go to the emergency room for further treatment. (*Id.*)

At a follow-up appointment with Dr. Shrestha later that month, Plaintiff continued to complain of right-sided numbness. (Doc. 14-10 at 19) Plaintiff acknowledged he had not yet begun the prescribed hypertension medication, Norvasc, because he "was out of insurance and couldn't afford [it]." (*Id.*) Dr. Shrestha advised Plaintiff to pick up the Norvasc, increased the dose of metformin for Plaintiff's diabetes, and directed him to "[c]onsider insulin." (*Id.* at 20) In addition, Dr. Shrestha noted that Plaintiff also had appointments set with a gastroenterologist and neurologist. (*Id.* at 21)

Dr. Shaista Rauf performed a neurological examination on December 28, 2013. (Doc. 14-10 at 23-24) Plaintiff reported he had constant "numbness affecting the right face, arm, and leg," but "he [did] not have any weakness." (*Id.* at 23) Dr. Rauf noted that a "[r]epeat CT scan of the head [was] performed." (*Id.*) According to Dr. Rauf, the CT showed "no evidence of acute stroke" and the previous hemorrhage was resolved. (*Id.*) Upon examination, Dr. Rauf found:

> Cranial nerves 2 though 12 were intact. Motor system showed normal tone, bulk, and strength in all 4 extremities. Deep tendon reflexes were slightly brisk in the right arm but otherwise, legs were normal or symmetrical. There was no objective sensory loss for pain, temperature, or vibration. His coordination was normal. Gait was normal. He was able to walk on toes, heels, and tandem walk was normal. Romberg was negative.

(*Id.*) Dr. Rauf opined Plaintiff's "paresthesia [was] all subjective," but the symptoms were "suggestive of [a] very small lacunar stroke." (*Id.*) Dr. Rauf prescribed baby aspirin to Plaintiff and instructed him "to return to [the] neurology clinic on an as-needed basis." (*Id.*)

In January 2014, Plaintiff had a "Diabetic eye exam" performed by Dr. Gupta Etwaru. (Doc. 14-10 at 28) Plaintiff was diagnosed with a "[v]ery early" cataract in both eyes. (*Id.* at 32)

In March 2014, Plaintiff returned to Dr. Shrestha, requesting a "work release note" because he wanted "to go back to work." (Doc. 14-15 at 33, 35)  Plaintiff said he continued to have right-sided numbness, "but [was] not much bothered by it." (*Id.* at 35)  He also told Dr. Shrestha that he was "taking his medications as prescribed." (*Id.*)  Dr. Shrestha noted Plaintiff's blood pressure 142/91, which she believed was "much better but not at goal." (*Id.* at 35, 36)  She adjusted Plaintiff's prescriptions and directed Plaintiff to return in three months. (*Id.*)  Dr. Shrestha opined Plaintiff was "Ok to return to work." (*Id.*)

Dr. S. Jaituni reviewed medical records related to Plaintiff's application at the initial level and completed a residual functional capacity assessment on August 11, 2014. (Doc. 14-4 at 5-8)  Dr. Jaituni noted Plaintiff had suffered from a stroke and had a "new complaint of numbness on R side of body," but neurological exams were normal. (*Id.* at 5)  Dr. Jaituni observed that both Plaintiff's treating physician and the neurologist believed Plaintiff's "stroke was resolved," and opined it was a "Non Severe" limitation. (*Id.*)  Dr. Jaituni opined Plaintiff could lift and carry up to 50 pounds frequently, sit "[m]ore than 6 hours on a sustained basis in an 8-hour workday, and stand and/or walk about 6 hours in an 8-hour day. (*Id.* at 7)  According to Dr. Jaituni, Plaintiff could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and had no limitations with balancing, stooping, kneeling, crouching, and crawling. (*Id.*)

Plaintiff returned to Dr. Shrestha in October 2014 after visiting the hospital for "severe back pain," reporting he "would like disability forms." (Doc. 14-11 at 12, 15)  Dr. Shrestha noted she had not seen Plaintiff since March, and Plaintiff reported that "[s]ince then has been homeless" and "[h]asn't been able to find a job." (*Id.* at 15)  In addition, Plaintiff indicated the he started using drugs again but denied alcohol use. (*Id.*)  Plaintiff told Dr. Shrestha that he continued to have "ongoing weakness and numbness on the [right] side of his body," and his leg sometimes gave out so he would use a cane. (*Id.*)   Dr. Shrestha noted that she counseled Plaintiff against drug and tobacco use and directed Plaintiff to increase his insulin dose until his sugar levels decreased. (*Id.* at 16)

On December 4, 2014, Plaintiff visited Dr. Shrestha to "discuss disability forms" and follow-up with his hypertension and diabetes. (Doc. 14-10 at 46)  Plaintiff reported that he had "stopped taking all meds except for Lantus and losartan" because the thought the medication combination was "making

him feel dizzy." (Doc. 14-11 at 19) Plaintiff said he last used amphetamine four days before, and he did not want to go to rehab because he thought he could "quit on his own when ready." (*Id.*) Plaintiff's blood pressure was 155/99, and Dr. Shrestha increased his prescription for losartan since he was "tolerating losartan well." (*Id.* at 20) On December 23, Dr. Shrestha noted Plaintiff's blood pressure was 191/116, and opined his hypertension was uncontrolled. (*Id.* at 26) She increased the prescription medication and directed Plaintiff to return in two weeks. (*Id.* at 27)

In January 2015, Dr. Shrestha noted Plaintiff's blood pressure was 207/121, and opined his hypertension remained uncontrolled. (Doc. 14-11 at 29-30) She also believed Plaintiff's diabetes was uncontrolled and increased the prescription for Lantus. (*Id.* at 30) The following week, Dr. Shrestha found his blood pressure was 175/98 and opined it was in "better control." (*Id.* at 33)

Plaintiff attended physical therapy for the numbness on the right side of his body on January 15, 2015. (Doc. 14-11 at 35) On an intake chart, Plaintiff indicated he had "moderate difficulty" with the squatting, running, and the movement of lying to sitting. (*Id.* at 38) Plaintiff also noted he had "little difficulty" with rolling over, sitting, bending/stopping, walking, lifting, and carrying. (*Id.*) Hector Oksenendler, PT, opined that Plaintiff walked with a normal gait and had good balance. (*Id.* at 35, 36) Mr. Oksenendler determined Plaintiff's range of motion, joint mobility, and strength were within functional limits. (*Id.* at 35) Mr. Oksenendler opined Plaintiff's stroke did not cause any "functional deficiency" and opined Plaintiff did "not hav[e] any limitation at the time" of the evaluation. (*Id.* at 36)

In February 2015, Plaintiff visited an emergency room to obtain an insulin pen refill, reporting he was about to run out of medication and could not see his doctor for another week. (Doc. 14-12 at 49) Upon examination, Plaintiff was "[n]eurologically grossly intact" and ambulatory. (*Id.*)

Dr. Pong reviewed medical records related to Plaintiff's request for reconsideration by the Administration in April 2015, and noted that Plaintiff was "somewhat to mostly non-compliant w/his [treatment] regimen for [hypertension] and [diabetes]." (Doc. 14-4 at 32) Dr. Pong believed that Plaintiff's condition had "not changed," and did not see any evidence in the record that would preclude Plaintiff from performing the residual functional capacity identified by Dr. Jaituni. (*Id.*)

Plaintiff visited an emergency room in September 2015, complaining of "chronic right shoulder pain" (Doc. 14-12 at 45) He stated he had the pain for two years, and was unable to see a primary care

physician due to a recent move.  (*Id.*)  Dr. Danielle Campagne found Plaintiff was "[n]egative for numbness, but he had a decreased range of motion with abduction in the shoulder "secondary to pain." (*Id.* at 46, 48)  Imaging of the right shoulder was negative.  (*Id.* at 46)  Plaintiff declined medication and "was referred to Clinica Sierra Vista."  (*Id.* at 46, 48)

Nearly a year later, in August 2016, Plaintiff visited a clinic to establish care.  (Doc. 14-12 at 14)  Plaintiff reported he had been diagnosed with hypertension and diabetes "but [had] not taken any medication for it for about 1 1/2 - 2 years."  (*Id.*)  Plaintiff told Simerjit Dhaliwal, PA-C, that he used marijuana to "keep[] his irritation from numbness from tingling of his right side of the body under control."  (*Id.*)  Mr. Dhaliwal observed that Plaintiff walked with a normal gait and had normal deep tendon reflexes.  (*Id.* at 15)  He referred Plaintiff to a neurologist due to Plaintiff's history of a stroke and right-sided paresthesia.  (*Id.* at 9, 15)

At appointments in September and October 2016, Mr. Dhaliwal refilled the medications and counseled Plaintiff regarding his treatment, diagnoses, medication, activity, and diet. (Doc. 14-12 at 3-4, 7)  Mr. Dhaliwal performed physical examinations at each visit, and noted Plaintiff's cranial nerves were "intact w/o any focal defecit (sic)" and Plaintiff had no ankle edema. (*Id.* at 3, 7)

Dr. Vladimir Royter performed a neurological examination on December 7, 2016, due to Plaintiff's continued complaints of right-sided numbness. (Doc. 14-11 at 64)  Dr. Royter noted Plaintiff reported his numbness was "getting worse recently."  (*Id.*)  Plaintiff told Dr. Royter that he "[n]ever" used alcohol or substances other than cigarettes.  (*Id.* at 65)  Upon examination, Dr. Royter found Plaintiff had normal range of motion, deep tendon reflexes, and motor function. (*Id.*)  Plaintiff was "unsteady on tandem walk" and had "Dysesthesia on the right to pinprick."  (*Id.*)  Dr. Royter recommended Plaintiff have a brain MRI and carotid ultrasound.  (*Id.* at 67)

Plaintiff underwent the MRI of his brain with and without contrast on February 2, 2017.  (Doc. 14-12 at 25-26, 88-89)  Dr. Sanjeev Athale noted, "[o]ld small lacunar infarcts [were] seen in the basal ganglia with chronic small vessel ischemic changes seen in the white matter."  (*Id.* at 26, 89)  Dr. Athale found no acute ischemic infarcts.  (*Id.*)

On April 20, 2017, Mr. Dhaliwal noted that Plaintiff visited for "paper work [to be] filled up for his lawyer for disability."  (Doc. 14-12 at 99) Mr. Dhaliwal observed that Plaintiff's blood pressure was

148/91, and he was not in acute distress.  (*Id.* at 100)  He completed the requested paperwork and advised Plaintiff it would be "the last time," since his office would "not deal with lawyers."  (*Id.* at 101)  On the medical source statement, Mr. Dhaliwal noted that Plaintiff had been diagnosed with a cerebrovascular accident (stroke), cataract, hepatitis, hypertension, diabetes, parasthesia, marijuana use, and insomnia.  (Doc. 14-13 at 2)  Mr. Dhaliwal believed Plaintiff could walk one block without rest or severe pain; sit for 15 minutes at one time; stand for 15 minutes at one time; and sit, stand, or walk less than 2 hours in an 8-hour day.  (*Id.*)  He also opined Plaintiff should use a cane for weakness.  (*Id.* at 3)  Mr. Dhaliwal indicated Plaintiff could rarely lift less than 10 pounds, twist, stoop, crouch, and climb.  (*Id.* at 3-4)  He believed Plaintiff was incapable of low stress work due to "multiple medical problems."  (*Id.* at 4)  According to Mr. Dhaliwal, Plaintiff was "unable to work" and his limitations had existed to that extent for a "long time."  (*Id.* at 5)

Dr. Boris Reznik examined Plaintiff related to his hepatitis C with cirrhosis on April 21, 2017.  (Doc. 14-12 at 55, 94)  According to Dr. Reznik, Plaintiff had "negative" neurologic, musculoskeletal, and psychiatric examinations aside from the low platelet count and elevated liver enzymes.  (*Id.*)  Dr. Reznik observed that Plaintiff's ambulation was "[w]ithin normal limits," and he had a normal gait.  (*Id.* at 58, 97)  In addition, Dr. Reznik opined Plaintiff had a normal range of motion, strength, motor function, and deep tendon reflexes; and he had no tenderness or deformities.  (*Id.*)

**B.    Field Report**

On June 5, 2014, N. Castellanoz, a Social Security field agent, performed a face-to-face interview with Plaintiff. (Doc. 14-8 at 3; *see also* Doc. 14-3 at 25)  According to the field agent, Plaintiff appeared "very thin" and "very disheveled."  (Doc. 14-8 at 3, emphasis omitted)  The field agent observed that Plaintiff did not demonstrate difficulty with hearing, understanding, coherency, concentrating, talking, sitting, standing, walking, seeing, using his hands, or writing.  (*Id.*)

**C.    Function Report**

Plaintiff completed a "Function Report" on March 18, 2015. (Doc. 14-8 at 47-55)  He indicated that he went outside every day and was able to drive.  (*Id.* at 48)  Plaintiff reported his hobbies included fishing, camping, and watching television; and he had "no problem with any" of these activities.  (*Id.* at 49)  Plaintiff reported he went "church once a week" and spent most of his time each day with his

girlfriend. (*Id.*) In a typical day, Plaintiff said he would "get up, make coffee, walk the dogs, come in [and] have breakfast, read, take a nap, get up, take a walk, have dinner, [and] go to bed." (*Id.* at 50) He noted he also was able to "sweep [and] mop" in their motor home, which took "maybe 20 [minutes] for both." (*Id.*) Plaintiff believed he could walk for about ½ mile without needing to rest and indicated he used a cane from "time to time," though it was not prescribed by a doctor. (*Id.* at 52-53)

**D.      Plaintiff's Hearing Testimony**

Plaintiff testified before the ALJ at an administrative hearing on August 3, 2017. (Doc. 14-3 at 56) He stated that he stopped using methamphetamine in 2014, and he had not used anything other than prescription drugs since that time. (*Id.* at 43)

He described himself as "less than half the man [he] used to be due to the strokes." (Doc. 14-3 at 61) Plaintiff said a stroke caused numbness on the right side, "all the way down from [his] head to … toes." (*Id.*) He stated that his feet were "the worst" and were "totally numb," which caused him to "fall quite a bit." (*Id.*) Plaintiff said his right leg would "give out[]…periodically," and he no longer wanted to go on walks. (*Id.*) Plaintiff said he was not prescribed a cane but borrowed one. (*Id.* at 62) Plaintiff believed the cane did not help because if his leg gave out, he would still fall. (*Id.* at 62) He estimated that he could stand and walk for 10 to 15 minutes at one time before he needed to sit. (*Id.* at 68) Plaintiff said he would walk to his mailbox, which was about "150 yards, 300 feet," and he was tired by the time he returned. (*Id.*) He also stated that when he kneeled, he would fall. (*Id.* at 63)

Plaintiff testified he had "no strength" in his right arm. (Doc. 14-3 at 61) He said his "hand eye coordination [was] gone" and he was no longer able to do activities such as ironwork or welding. (*Id.* at 62) Plaintiff said he was injured "some years ago and [he] was permanently disabled," and believed he "lost 15 percent of mobility and strength in [his] right arm." (*Id.* at 64) Despite the injury, Plaintiff said he was able to do "regular work as usual" until numbness caused a loss of strength. (*Id.*) Plaintiff stated he dropped glasses and a plate of food because he did not have "any strength to hold them," and he could not "open a jar like [he] used to." (*Id.* at 67) He explained he could lift and carry a gallon of milk with both hands, and carry about "10, 12 ounces" of food to feed his dogs. (*Id.* at 67-68)

He reported he "never fully agreed that [he] had diabetes" and, though doctors told him to check his sugar levels, he did not check on a daily basis. (Doc. 14-3 at 70) He said he would check it "[o]nce

or twice a week." (*Id.*)  Plaintiff testified that he took the metformin as prescribed, twice a day.  (*Id.*)

**E.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff not engaged in substantial gainful activity since the alleged disability onset date of November 11, 2013.  (Doc. 14-3 at 18)  Second, the ALJ found Plaintiff's severe impairments included "cerebrovascular accident, hypertension, and diabetes mellitus."  (*Id.*)  At step three, the ALJ determined Plaintiff's impairment did not meet or medically equal a Listing.  (*Id.* at 21-22)  Next, the ALJ found:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 4041567(c) and 416.967(c) except that he can, at most: lift or carry fifty pounds occasionally, and twenty-five pounds frequently; stand or walk for at least six hours in an eight-hour workday; and sit for at least six hours in an eight-hour workday. The claimant can only frequently climb ramps or stairs; and occasionally climb ladders, ropes, or scaffolds.

(*Id.* at 22)  With this residual functional capacity, the ALJ found Plaintiff was "capable of performing past relevant work as a tow-truck operator."  (*Id.* at 27)  In the alternative, at step five, the ALJ determined there were "other jobs that exist in significant numbers in the national economy that the claimant can also perform."  (*Id.* at 28)  Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 29)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny his applications for benefits, Plaintiff argues that the ALJ erred in evaluating the medical record, particularly the opinion of Mr. Dhaliwal.  (Doc. 17 at 7)  Plaintiff also asserts the ALJ failed "to properly consider Plaintiff's subjective symptoms complaints as required by the regulations."  (*Id.* at 11)  On the other hand, the Commissioner argues the ALJ's evaluations of the opinion evidence and symptom allegations are supported by substantial evidence. (Doc. 18 at 8)

**A.     Evaluation of the Medical Evidence**

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the

greatest weight, but it is not binding on the ultimate issue of a disability. *Id.; see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. § 404.1527(d)(2). Finally, an ALJ must consider the opinions of other medical professionals— such as nurse practitioners, physician assistants, and social workers—who may offer "judgment about some of the same issues addressed in medical opinions from acceptable medical sources." 20 C.F.R. § 404.1527(f)(1); *see also Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (describing circumstances when opinions from "other sources" may be considered acceptable medical opinions).[1]

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). An ALJ may reject the opinion of a medical sources that is contradicted by another opinion with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

The ALJ gave "substantial weight" to the opinions of Drs. Jaituni and Pong, who reviewed the record at the initial level and upon reconsideration. (Doc. 14-3 at 25-26) The ALJ indicated "very little weight" was given to the opinion of Mr. Dhaliwal, PA-C. (*Id.* at 26) Plaintiff contends the ALJ failed to identify a legally sufficient reason to reject the opinion of Mr. Dhaliwal. (Doc. 17 at 7-11)

1.     The ALJ's evaluation of Mr. Dhaliwal's opinion

As noted above, an ALJ must consider the opinions of physician assistants when reviewing the medical record. 20 C.F.R. § 404.1527(f)(1); *Revels*, 874 F.3d at 655. However, physician assistants

---

[1] The Social Security Administration has recently adopted new rules applicable to claims filed after March 27, 2017, which expand the category of acceptable medical providers to include, among others, nurse practitioners. 20 C.F.R. §§ 404.1502(a)(6), (7), (8); 416.902(a)(6), (7), (8) (2017); *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). These revisions do not apply to Plaintiff's claim, which was filed in 2014.

are not considered acceptable medical sources, but rather "other sources." *Id.* Opinions from "other sources," such as physician assistants and nurse practitioners, "are not entitled to the same deference" as those of a physician. *Revels*, 874 F.3d at 655. Thus, the opinions of "other sources" "may be discounted [if] the ALJ provides reasons germane to each source for doing so." *Fields v. Comm'r of Soc. Sec.*, 2019 WL 3003992 at *3 (E.D. Cal. July 10, 2019) (citing *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017)); *see also Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012) (opinions from other sources may be rejected with germane reasons). Thus, because Mr. Dhaliwal was a physician assistant, the ALJ could reject the limitations identified by Mr. Dhaliwal by providing germane reasons.

In reviewing the medical record, the ALJ stated "very little weight" was given to the opinion of Mr. Dhaliwal because he was not an acceptable medical source, the conclusions were not supported by the objective evidence, and conflicted with other evidence in the record. (Doc. 14-3 at 26) Specifically, the ALJ stated:

> Simerjit Dhaliwal, M.S., P.A.C., a treating source (18F), opined on the claimant's residual functional capacities in April 2017. Mr. Dhaliwal opined that the claimant cannot even sit for two hours in an eight-hour workday. (18F.) He also opined that the claimant cannot ever lift or carry even ten pounds. (18F.) This statement is given very little weight. This form contains little narrative description or references to the claimant's treatment records of a link between Mr. Dhaliwal's conclusions, and the claimant's objective medical evidence of record. This statement also does not evidence knowledge of the claimant's longitudinal treatment of record. Mr. Dhaliwal is also not an acceptable medical source, further diminishing the utility of his statement. Finally, Mr. Dhaliwal's opinion is not consistent with the medical evidence of record, including records of the claimant ambulating normally (1F/22; 3F/34; 5F/3; 8F/14; 11F/7; 13F/9; 16F/4; 20F/31). This statement is also no[t] consistent with notations of the claimant exhibiting normal whole-body strength (1F/10, 15, 22; 3F/34; 6F/8; 8F/19; 11F/11; 13F/9; 15F/5; 16F/4; 20F/31).

(*Id.*) Plaintiff contends this "discussion is inaccurate and insufficient to constitute a germane reason for rejecting the opinion." (Doc. 17 at 9)

### a.    Status as an "other source"

As an initial matter, Plaintiff asserts that "the ALJ rejected the opinion because Mr. Dhaliwal was not an acceptable medical source." (Doc. 17 at 9) Plaintiff appears to argue this was an error, because "Mr. Dhaliwal is the only source with a treating relationship to evaluate Plaintiff's functioning, and he regularly treated Plaintiff's chronic conditions and coordinated his care with specialists." (*Id.*)

Importantly, however, the Regulations clearly state that physician assistants are not considered

acceptable medical sources, but rather "other sources." 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1). Thus, the ALJ did not err in stating that Mr. Dhaliwal was "not an acceptable medical source," or that the utility of his statement was diminished on these grounds, compared those of physicians who offered opinions in the record.

### b.  Lack of narrative or link to treatment records

The opinion by a physician may be rejected "if brief and conclusory in form with little in the way of clinical findings to support [its] conclusion." *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986). The ALJ found the "Physical Medical Source Statement" completed by Mr. Dhaliwal lacked narrative descriptions or a link to the treatment notes. (Doc. 14-3 at 26) The lack of narrative— including clinical findings— linking the opinions and the treatment records may be a germane reason for rejecting the limitations identified.

Plaintiff contends the opinion of Mr. Dhaliwal "was not unexplained or unsupported, because he submitted the form with accompanying treatment records." (Doc. 17 at 9) Plaintiff observes that Mr. Dhaliwal "referenced the attachment in his opinion, and treatment records dated the same day of the opinion shed light on the basis for his assessment." (*Id.*) According to Plaintiff, "These treatment notes confirm that Mr. Dhaliwal competed disability forms due to Plaintiff's stroke residuals, and he has been treating with a neurologist for worsening paresthesia." (*Id.*) Thus, Plaintiff argues "the ALJ was incorrect to conclude that the form lacked references to the claimant's treatment records or a link between his conclusions and the treatment notes." (*Id.*)

Plaintiff fails to identify any specific clinical findings linking the limitations identified by Mr. Dhaliwal and the treatment notes. In the notes cited by Plaintiff, dated April 20, 2017—the same as the "Physical Medical Source Statement"—Mr. Dhaliwal indicated Plaintiff requested "paper work [to be] filled up for his lawyer for disability." (Doc. 14-12 at 99) That day, Mr. Dhaliwal found Plaintiff's blood pressure was 148/91, and he was not in acute distress. (*Id.* at 100) There were no observations or findings related to Plaintiff's strength or ambulation. (*See id.*) Because Mr. Dhaliwal did not provide any narrative information or clinical findings in the "Medical Source Statements" that could be linked to the treatment notes, the lack of narrative and conclusory form of the statement support the ALJ's decision to give little weight to the limitations identified by Mr. Dhaliwal.

### c. *Lack of knowledge of longitudinal treatment*

The ALJ observed that Mr. Dhaliwal's statement did not demonstrate "knowledge of the claimant's longitudinal treatment of record." (Doc. 14-3 at 26) Indeed, Mr. Dhaliwal noted that he had treated Plaintiff only since August 2016, and indicated that the "onset date for the … limitations" identified was a "long time." (Doc. 14-13 at 4-5)

Plaintiff fails to address this reason for giving less weight to the opinions of Mr. Dhaliwal. (*See* Doc. 17 at 9-10) Indeed, nothing in the medical statement—or treatment notes— indicates that Mr. Dhaliwal reviewed treatment records related to Plaintiff's stroke or hypertension. To the contrary, after Mr. Dhaliwal referred Plaintiff to the neurologist, it was noted that the clinic had "no records and no imaging study results" related to Plaintiff's stroke or hospital admission. (Doc. 14-12 at 18)

Significantly, knowledge of a claimant's treatment history is a proper factor for an ALJ to consider in evaluating the weight to give a medial source opinion. *See* 20 C.F.R. §§ 404.1527(c)(2)(i). 416.927(c)(2)(i) ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"); *see also Martinez v. Colvin*, 2016 WL 2347857 at*6 (D. Vermont May 4, 2016) (finding the ALJ did not err in considering the fact that a physician "lacked a longitudinal treatment history … or very detailed knowledge of his impairments over time"). Thus, Mr. Dhaliwal's lack of knowledge related Plaintiff's medical history was a germane reason for rejecting limitations identified.

### d. *Conflict with the medical record*

The Ninth Circuit determined a medical opinion may be rejected where an ALJ finds incongruity between a treatment provider's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008). Similarly, inconsistency with the overall record constitutes a legitimate reason for discounting a medical opinion. *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999). To reject an opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more than offer [her] conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not

achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

The ALJ found the limitations identified by Mr. Dhaliwal were not consistent with the medical record, which included observations that Plaintiff was "ambulating normally." (Doc. 14-3 at 26, citing 1F/22; 3F/34; 5F/3; 8F/14; 11F/7; 13F/9; 16F/4; 20F/31) Plaintiff contends the ALJ erred in finding the limitations identified by Mr. Dhaliwal were inconsistent with the record because Dr. Royter "observed unsteadiness with tandem gait" in December 2016. (Doc. 17 at 9, citing AR at 510 [Doc. 14-11 at 65]) However, Plaintiff fails to acknowledge the numerous observations and findings throughout the record that Plaintiff ambulated normally following his stroke, as the ALJ cited. For example, at a neurological consultation, Dr. Rauf observed that Plaintiff's coordination and gait were normal, and he "was able to walk on toes, heels, and tandem walk." (Doc. 14-10 at 23) When Plaintiff went to physical therapy for the numbness on the right side of his body in January 2015, Hector Oksendler, PT, opined that Plaintiff walked with a normal gait and had good balance. (Doc. 14-11 at 35, 36) In August 2016, Mr. Dhaliwal observed that Plaintiff "walked with a normal gait." (Doc. 14-12 at 15) Likewise, Dr. Reznik opined Plaintiff's ambulation was "[w]ithin normal limits," and he had a normal gait in April 2017. (*Id.* at 55, 94)

Further, the ALJ identified findings related to Plaintiff's strength that conflicted with the opinion of Mr. Dhaliwal that Plaintiff "cannot ever lift or carry even ten pounds." (Doc. 14-3 at 26, citing Doc. 14-13 at 3) Specifically, the ALJ found the limitations conflicted with "notations of the claimant exhibiting normal whole-body strength." (*Id.*, citing Exh. 1F/10, 15, 22; Exh. 3F at 34; Exh. 6F/8; Exh. 8F/19; Exh.11F/11; Exh.13F/9; Exh.15F/5; Exh.16F/4; and Exh. 20F/31) The ALJ noted:

> On three separate occasions throughout November 2013 and December 2013 sources found the claimant exhibiting entirely full and normal strength ("5/5") in "all four extremities." (1F/10, 15, 22.) In January 2015 providers described the claimant's whole-body strength as "within functional limits." (3F/34.) In April 2017 providers said that the claimant revealed "normal" whole-body musculoskeletal strength. (13F/9.) Sources on several occasions including in January 2017, said that the claimant revealed "normal motor function." (6F/8; 8F/19; 11F/11; 13F/9; 15F/5; 16F/4.) Further regarding the claimant's neurological functioning, the claimant's coordination has remained intact too. In December 2013 sources recorded the claimant exhibiting "normal" coordination. (1F/22.)

(Doc. 14-3 at 23-24) As noted by the ALJ, physicians repeatedly found Plaintiff had full strength in his extremities following his stroke. Only two months later, in November 2013, Dr. Shrestha found

Plaintiff's motor strength was "5/5 in all 4 extremities." (Doc. 14-10 at 11) The following month, despite Plaintiff's reports of "subjective numbness on the [right] side," she again found Plaintiff's strength was "5/5 in all 4 extremities." (*Id.* at 16) Likewise, more than two years after the stroke, Mr. Oksenendler also found Plaintiff's strength was within functional limits and opined the stroke was "without functional deficiency" because no limitations were identified during the physical therapy evaluation. (Doc. 14-11 at 35-36)

Because the ALJ met the burden to identify specific objective findings in the record that were inconsistent with the limitations identified by Mr. Dhaliwal, the inconsistencies with the record also constitute a germane reason for giving less weight to the opinion. *See Morgan*, 169 F.3d at 602-03; *Embrey*, 849 F.2d at 421.

2.      Substantial evidence supports the ALJ's evaluation

The decision of an ALJ must be "supported by substantial evidence in the record." *Lester*, 81 F.3d at 830. The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[2]. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.* The opinions of non-examining physicians, such as Drs. Jaituni and Pong, "may constitute substantial evidence when ... consistent with other independent evidence in the record." *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

Plaintiff contends the ALJ failed to meet this burden because "the ALJ erroneously relied on the opinions from the non-examining physicians who lacked access to a complete medical file, and did not have the opportunity to perform a personal medical evaluation." (Doc. 17 at 10) According to Plaintiff:

> Based on the records available, these physicians found that only Plaintiff's hypertension, diabetes, and liver disease were severe physical impairments, and they did not asses any limitations related to Plaintiff's stroke residuals. Ar. 94-96, 120-21. This is because their assessments were completed before Dr. Royter's neurological

---

[2] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

evaluation due to worsening paresthesia, with examination findings of dysesthesia on the right to pinprick, and unsteadiness with tandem walk. Ar. 510. Dr. Royter diagnosed history of stroke, dysesthesia, and imbalance. Ar. 511. The non-examining physician's opinions were also rendered without the benefit of the MRI of Plaintiff's brain, which revealed multiple white matter hyperintensities, consistent with moderate chronic white matter ischemic changes, and old small lacunar infarcts in the basal ganglia with chronic small vessel ischemic changes. Ar. 515-16.

(Doc. 10-11)

On the other hand, the Commissioner argues that the ALJ did not err on relying upon the opinions of Drs. Jaituni and Pong after rejecting Mr. Dhaliwal's opinion, because the physicians' opinions "were both consistent with the record and well-explained." (Doc. 18 at 9) The Commissioner argues that both reasons for giving substantial weight to the opinions "were appropriate under the regulations and case law, and provided substantial evidence in support of the ALJ's finding. (*Id.*, citing 20 C.F.R. §§ 404.1527(c)(3)-(4) [ALJ considers how well a source explains and supports an opinion and how consistent an opinion is with the record]); *Thomas*, 278 F.3d at 957 ["The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record"]). Further, the Commissioner contends Drs. Jaituni and Pong addressed Plaintiff's status following the stroke, " including his good recovery, his normal neurological findings on examination, his noncompliance with prescribed treatment, and his favorable response to treatment when compliant." (*Id.*)

Plaintiff fails to demonstrate the findings of Dr. Royter and the MRI alone undermine the findings of Drs. Jaituni and Pong. In fact, Dr. Royter was the only physician who indicated Plaintiff walked with an unsteady gait, and months later Dr. Reznik observed that Plaintiff's "ambulation was "[w]ithin normal limits," and he had a normal gait. (*See* Doc. 14-12 58, 97) Further, Plaintiff fails to show the MRI contained any new information for the physician. To the contrary, Dr. Athale found the MRI showed only *old* small lacunar infarcts and no acute ischemic infarcts. (Doc. 14-12 at 26, 89)

As the Commissioner argues, Drs. Jaituni and Pong both reviewed records following Plaintiff's stroke, including his allegations of numbness and worsening symptoms, and yet declined to offer functional limitations due to the stroke. Specifically, Dr. Jaituni observed Plaintiff had suffered from a stroke and had a "new complaint of numbness on R side of body," but neurological exams were normal. (Doc. 14-4 at 5) Further, Dr. Jaituni noted that both Plaintiff's treating physician and a

17

neurologist believed Plaintiff's "stroke was resolved," and opined it was a "Non Severe" limitation. (*Id.*) Likewise, Dr. Pong believed that Plaintiff's condition had "not changed," despite Plaintiff being "somewhat to mostly non-compliant w/ his [treatment] regimen for [hypertension] and [diabetes]." (Doc. 14-4 at 32)

The ALJ reviewed the findings of Drs. Jaituni and Pong and gave them "substantial weight" explaining they had "a thorough knowledge of the claimant's longitudinal medical evidence of record." (Doc. 14-3 at 25) Further, the ALJ found the opinions of Drs. Jaituni and Pong were in "accord with the objective medical evidence of record especially records of the claimant revealing full whole-body range of motion." (*Id.*, citing 3F/34; 6F/8; 8F/19; 11F/11; 13F/9; 15F/5; 16F/4; and 20F/31.) The Court agrees the finding of Drs. Jaituni and Pong are consistent with other evidence in the record, including the findings of Drs. Shrestha and Rauf. For example, Drs. Shrestha found Plaintiff's cranial nerves were grossly normal and his motor strength was "5/5 in all 4 extremities" only a few months after the stroke, despite reports of "subjective numbness on the [right] side." (Doc. 14-10 at 16) Similarly, Dr. Rauf noted Plaintiff's symptoms were "suggestive of [a] very small lacunar stroke" during the neurological examination—to which Dr. Jaituni referred—and determined:

> Motor system showed normal tone, bulk, and strength in all 4 extremities. Deep tendon reflexes were slightly brisk in the right arm but otherwise, legs were normal or symmetrical. There was no objective sensory loss for pain, temperature, or vibration. His coordination was normal. Gait was normal. He was able to walk on toes, heels, and tandem walk was normal. Romberg was negative.

(Doc. 14-10 at 23) Thus, despite the lacunar stroke, Plaintiff maintained a normal strength and gait according to Drs. Shrestha and Rauf.

The opinions of Drs. Jaituni and Pong that Plaintiff did not have any functional limitations resulting from the stroke are also consistent with the conclusion of Plaintiff's physical therapist, Mr. Oksenendler, who found Plaintiff walked with a normal gait and had good balance in January 2015. (Doc. 14-11 at 35, 36) Mr. Oksenendler determined Plaintiff's range of motion, joint mobility, and strength were within functional limits; and Plaintiff's stroke did not cause any "functional deficiency." (*Id.* at 36)

Because the conclusions of Drs. Jaituni and Pong were consistent with the medical record— other independent evidence in the record and objective findings of others— their conclusions are

substantial evidence in support of the ALJ's determination.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

**B.      Evaluation of Plaintiff's Subjective Testimony**

In evaluating a claimant's statements regarding his symptoms, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints.  *Id.* at 1036; *see also Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

If there is objective medical evidence of an underlying impairment, an ALJ may not discredit a claimant's testimony as to the severity of symptoms merely because it is unsupported by objective medical evidence. *See Bunnell v. Sullivan*, 947 F.2d 341, 347-48 (9th Cir. 1991) The Ninth Circuit explained:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the *Cotton* test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

*Smolen v. Chater* 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the credibility test established in *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986)).

An ALJ may consider additional factors to assess a claimant's credibility including, for example: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (an ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when

weighing the claimant's credibility).

The ALJ determined first that Plaintiff had medically-determinable physical impairments, including a "cerebrovascular accident, hypertension, and diabetes mellitus." (Doc. 14-3 at 22-23) However, the ALJ found the evidence in the record was "incongruous with the claimant's allegations of disabling disorders." (*Id.* at 23) The ALJ found Plaintiff's reports of his symptoms were not consistent with Plaintiff's desire to work, his reported activities, observations of a Social Security representative, and the medical record. (*Id.* at 23-26) Plaintiff contends the reasons identified by the ALJ were "not clear and convincing, because they are not supported by the record." (Doc. 17 at 13)

### 1.    Intent to work

The ALJ observed, "Even the claimant has believed that he is capable of work after his alleged onset date." (Doc. 14-3 at 25) Specifically, the ALJ noted: "On November 22, 2013, the claimant asked his treating sources to complete forms so that he could return to work. (1F/9.) In March 2014 the claimant said that he 'wants to go back to work.' (19F/12.)" (*Id.*)

Plaintiff contends his intent to work does not support the ALJ's adverse credibility determination, arguing "the fact that Plaintiff requested work-release forms and made good-faith efforts to return to work after his stroke does not undermine the legitimacy of his allegations." (Doc. 17 at 13) According to Plaintiff, his "attempts to work are not indicative of an ability to actually maintain substantial gainful activity, and he was clearly unsuccessful in his efforts to continue working." (*Id.*)

Significantly, however, "[i]t is permissible for the ALJ to consider the totality of the claimant's testimony, especially testimony that indicates that the claimant is willing to and thinks he is able to engage in some types of work that contradict his application for disability benefits." *Phillips v. Colvin*, 61 F.Supp.3d 925, 944 (N.D. Cal. 2014). Indeed, when Plaintiff requested a "work release note" in March 2014 because he wanted "to go back to work," Dr. Shrestha opined Plaintiff was "Ok to return to work." (Doc. 14-15 at 33, 35-36) Months later, Plaintiff told Dr. Shrestrha that he "[h]asn't been able to find a job" and stated he "would like disability forms." (Doc. 14-11 at 12, 15) Thus, the record supports the ALJ's finding that Plaintiff expressed an intent to work, and the ALJ properly considered this intent when evaluating Plaintiff's allegations regarding the severity of his symptoms. *See Phillips*, 61 F.Supp.3d at 944; *see also Bray v. Comm'r of SSA*, 554 F.3d 1219, 1227 (9th Cir. 2009).

### 2. Level of activity

The Ninth Circuit determined that a claimant's level of activity—such as claimant's ability to cook, clean, do laundry, and manage her finances— may be sufficient to support an adverse finding of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances..."). Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

In this case, the ALJ determined: "The claimant's own reported functionality is further inconsistent with a finding of disability." (Doc. 14-3 at 22) The ALJ observed:

> The claimant alleges that status post [stroke], status post aneurysm, and diabetes, prohibit him from working. [Citation.] However, he relates that he remains able to drive a motor vehicle. [Citation.] In fact, the claimant says that he has "no problem" engaging in his hobbies including fishing, and camping. [Citation.] The claimant also relates that his daily routine includes taking two walks per day. [Citation.] He says further that he has "no problem" compiling his personal care including dressing, bathing, and caring for his hair. [Citation.] The claimant admits in his function report that he remains able to sweep and mop, and does not require assistance completing these chores. [Citation.]

(*Id.* at 25) Thus, the ALJ concluded Plaintiff's level of activity was "inconsistent with the claimant's allegations that he cannot work." (*Id.* at 23)

Because Plaintiff retained the ability to perform activities of daily living—despite the allegations of disabling pain and loss of strength— the level of activity supports the determination that his impairments were not as disabling as Plaintiff alleged. *See Stubbs-Danielson,* 539 F.3d at 1175; *Burch,* 400 F.3d at 681; *see also Molina v. Astrue,* 674 F.3d 1104, 1113 (9th Cir. 2012) ("Even where … activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment"). Thus, the Court finds the ALJ did not err in considering Plaintiff's reported level of activity to support the adverse credibility determination.

### 3. Observations of the field agent

The ALJ found that observations of a Social Security field agent during a face-to-face interview

"further belie the reliability of the claimant's allegations." (Doc. 14-3 at 25) The ALJ noted that a field agent indicated "the claimant experienced no difficulty writing, using his hands, walking, standing, sitting, or reading." (*Id.*, citing Exh. 1E [Doc. 14-8 at 3]) The ALJ concluded these observations were "not consistent with the claimant's allegations of acute functional deficits and therefore undermine the reliability of those contentions." (*Id.*)

Plaintiff argues "the ALJ's reliance on the observations of agency employees is not a convincing reason for rejecting Plaintiff's subjective symptom complaint." (Doc. 17 at 14) According to Plaintiff, "The 'observations' to which the ALJ refers is simply a list of actions, on which the employee would designate whether she observed any difficulty with those activities. [Citation.] There is no indication that the employee actually had the opportunity to observe the Plaintiff engage in each listed activity, such as writing or using his hands, or the degree of interaction Plaintiff had with this employee." (*Id.*, citation omitted)

The Commissioner argues the observations of the field agent were properly considered by the ALJ because the Regulations provide "an ALJ can consider 'observations by our employees and other persons' when evaluating symptom allegations." (Doc. 18 at 15-16, quoting 20 C.F.R. §404.1529(c)(3). Thus, because "Plaintiff alleged that he could not hold onto items, and had numbness in his feet that limited his standing and caused him to fall when walking," the Commissioner argues "the ALJ reasonably relied on observations from an impartial source that conflicted with those claims as a reason to reject them." (*Id.* at 15)

Notably, as the Commissioner argues, the Regulations provide observations of Social Security employees and others may be considered when "[e]valuating the intensity and persistence of [a claimant's] symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Likewise, Social Security Ruling[3] 16-3P indicates: "We will consider any statements in the record noted by agency personnel who previously interviewed the individual, whether in person or by telephone. The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms…" SSR 16-3P, 2017 WL 5180304 at *7. Thus,

---

[3] Social Security Rulings are issued by the Commissioner to clarify regulations and policies. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

22

observations of a Social Security employee may be used to support a finding that a claimant's alleged impairments are not as severe as alleged.

As the ALJ noted, a field agent observed that Plaintiff "experienced no difficulty writing, using his hands, walking, standing, sitting, or reading." (Doc. 14-3 at 25) Although Plaintiff argues there is no indication that the employee actually observed these activities, the form indicates that the employee should identify any difficulties observed with activities, "or show 'No' or 'Not observed/ perceived'" (Doc. 14-8 at 3) Thus, had the activities not been observed, there was a mechanism for the employee to indicate this fact. (*Id.*) Instead, N. Castellanoz clearly indicated that Plaintiff did not demonstrate difficulties with the activities identified during the face-to-face interview on June 5, 2014. (*Id.* at 3-4) As the ALJ found, the observations were "not consistent with the claimant's allegations of acute functional deficits," and support the determination Plaintiff's allegations were not consistent with the record.

### 4. Objective medical evidence

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine… credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining evaluating Plaintiff's statements.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is

credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

The ALJ determined, "the objective medical evidence does not establish physical conditions of a severity consistent with the claimants alleged impairments." (Doc. 14-3 at 23) According to the ALJ, "Especially convincing are the multiple records of the claimant ambulating normally, and exhibiting intact strength, sensation, and range of motion." (*Id.* at 25) In particular, the ALJ observed:

> [P]roviders have often noted the claimant with substantial retained functionality. For instance, physicians have often found the claimant ambulating normally, with a wholly unaffected gait. (1F/22; 3F/34; 5F/3; 8F/14; 11F/7; 13F/9; 16F/4; 20F/31.) Sources in December 2013 said that the claimant's gait was normal. (1F/22.) In May 2015 providers said that the claimant's gait was within normal limits. (5F/7.) More recently in April 2017 Boris Reznik, M.D., a treating source, found the claimant exhibiting a "normal" gait. (16F/4.) In that same vein, sources have recorded the claimant exhibiting intact balance. (3F/35; 20F/31.) In January 2015 sources reported that the claimant's balance was "good." (3F/35.)

> The claimant has revealed full and normal whole-body strength over the whole record as well. (1F/10, 15, 22; 3F/34; 6F/8; 8F/19; 11F/11; 13F/9; 15F/5; 16F/4; 20F/31.) On three separate occasions throughout November 2013 and December 2013, sources found the claimant exhibiting entirely full and normal strength ("5/5") in "all four extremities." (1F/10, 15, 22.) In January 2015 providers described the claimant's whole-body strength as "within functional limits." (3F/34.) In April 2017 providers said that the claimant revealed "normal" whole-body musculoskeletal strength." (13F/9.) Sources on several occasions, including in January 2017, said that the claimant revealed "normal motor function." (6F/8; 8F/19; 11F/11; 13F/9; 16F/4.) Further regarding the claimant's neurological functioning, the claimant's coordination has remained intact too. In December 2013 sources recorded the claimant exhibiting "normal" coordination. (1F/22.)

> The claimant's whole-body range of motion has remained full and undiminished over the whole record. (3F/34; 6F/8; 8F/19; 11F/11; 13F/9; 15F/5; 16F/4; 20F/31.) In January 2015 providers said that the claimant's range of motion was "within normal limits." (3F/34.) Sources in December 2016 found the claimant's musculoskeletal range of motion "normal." (6F/8.) Just one month later in January 2017 providers again said that the claimant's whole-body range of motion was normal. (11F/11.) Most recently in April 2017 providers found the claimant demonstrating "normal" range of motion. (13F/9.) Sources have also described the claimant's range of motion, and joint mobility, [as] "within functional limits." (3F/34.)

> The claimant's sensation has remained intact over the record. (1F/10, 22, 23; 13F/9; 16F/4.) In December 2013 sources said that "there was no objective sensory loss for pain temperature or vibration." (1F/22.) At the claimant's aforementioned April-2017 examination, sources found the claimant's sensation "normal." (16F/4.) Sources have found the claimant's cranial nerves full and intact over the whole record as well. (1F/22; 6F/8; 8F/14, 19; 11F/7, 11; 13F/9; 16F/4.) In December 2013 sources said that the claimant's cranial nerves were intact. (1F/22.) Providers made identical findings three years later in December 2016. (8F/20.) The claimant's reflexes have remained intact as well. (6F/8; 8F/14, 19; 11F/11; 13F/9; 15F/5; 16F/4.) For example, in August 2016 providers said that the claimants deep-tendon reflexes were "normal." (8F/14.)

24

> The record also indicates that the claimant has retained normal vision. The claimant has in fact denied blurry vision. (3F/25, 28, 31; 20F/10, 17, 24.) In December 2014 the claimant specifically denied blurry vision. (20F/10.) Suellen testing has confirmed those reports, revealing normal vision. (1F/28, 30; 19F/19, 22.) At the claimant's eye examination in January 2014 the claimant achieved 20/25 right-eye vision and 20/25 left-eye vision. (1F/28.)

(Doc. 14-3 at 23-24)   Notably, Plaintiff does not address any of these clinical findings identified by the ALJ in evaluating Plaintiff's subjective symptom complaints.  (*See* Doc. 17 at 11-14)

Because the ALJ satisfied the burden to identify specific clinical findings that were inconsistent with Plaintiff's statements concerning the severity of his impairments, the objective medical record supports the ALJ's decision to reject Plaintiff's statements. *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

   5.   Effectiveness of treatment

The ALJ found Plaintiff's severe impairments included hypertension.  (Doc. 14-3 at 18) However, the ALJ determined "treatment is effective at managing that condition."  (*Id.* at 24)  The ALJ observed:  "In March 2014 the claimant reported that he had been taking his medications 'as prescribed.'  Sources indeed found the claimants blood pressure reduced (19F/13) and concluded that his blood pressure was 'controlled' (19F/12.)"  (*Id.*)

When an impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin*., 439 F.3d 1001, 1006 (9th Cir. 2006).  Thus, when an ALJ finds a claimant's treatment is effective, such a finding supports an adverse credibility determination.  *See, e.g., Traynor v. Covlin*, 2014 WL 4792593, at *9 (evidence that the claimant's symptoms were managed with medication was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment); *Jones v. Comm'r of Soc. Sec.,* 2014 WL 228590, at *7-10 (E.D. Cal. Jan. 21, 2014) (the ALJ properly found that the claimant's credibility was diminished due to the reported relief provided by treatment).

Plaintiff does not challenge, or even acknowledge, the ALJ's findings regarding the effectiveness of the treatment.  (*See generally* Doc. 17 at 11-14)  Given the documented improvement provided by Plaintiff's medication, the Court finds the effectiveness of the treatment received also

supports the adverse credibility determination, and the ALJ did not err in considering this factor.

### 6.    Conclusion

The ALJ properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. Accordingly, the Court finds the ALJ did not err in concluding Plaintiff's "statements concerning the intensity persistence and limiting effects of these symptoms cannot be wholly accepted." (Doc. 14-3 at 26)

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ set forth germane reasons to reject the limitations identified by Mr. Dhaliwal, and the decision is supported by substantial evidence in the record. Further, the ALJ identified clear and convincing reasons to support the adverse credibility determination and reject Plaintiff's subjective statements. Thus, the Court must uphold the conclusion that Plaintiff was not disabled as defined by the Social Security Act. *Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1.    The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.    The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant, the, Commissioner of Social Security, and against Plaintiff Gary Marion Oliver.

IT IS SO ORDERED.

Dated:   __February 27, 2020__          _____/s/ Jennifer L. Thurston__
                                                        UNITED STATES MAGISTRATE JUDGE